## Case No. 8,087.

### LARCO v. The MARTHA AND ELIZABETH.

[1 Sawy. 129.] [1]

District Court, D. California. April 13, 1870.

COLLISION—FAILURE TO DISPLAY LIGHTS.

A claim for damages by collision rejected; it appearing that the injured vessel omitted to display the lights required by law.

[This was a libel by Andrea Larco against the schooner Martha and Elizabeth for the recovery of damages caused by collision.]

Sullivan & Ellsworth, for libellant.

Milton Andros, for claimant.

HOFFMAN, District Judge. On the night of the eighteenth January, the schooner Aulalia, which had that evening come in from sea, while at anchor in the strait which connects the Bay of Bodega with the ocean, was run into and damaged by the schooner Martha and Elizabeth, then entering the harbor to avoid an impending southeaster.

On the easterly side of the strait, by which the Bay of Bodega is reached, is a high bluff projecting into the sea, and known as Bo-

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

dega Head. On the westerly side is a low sand spit. Between these is a narrow and sinuous passage, varying in width from fifty to one hundred yards. At the immediate entrance of this passage, and opposite to the sand spit the shore line of the bluff is curved, and an indentation or bight is formed, but of no considerable depth. The formation of the harbor is such that vessels approaching it, especially from the southward and westward, are compelled to hug closely the shore of the bluff, and it is only after they have rounded its easternmost point that the bight is opened, and vessels lying there become visible. From this point to the place where the Aulalia lay, the distance is about two hundred yards. On the night in question the Martha and Elizabeth was entering the harbor by the customary route. She had on either side the light required by law. The mate and a seaman were forward as lookouts, and the master was at the helm.

It is admitted that neither the Aulalia, the Ocean Spray, which lay near her, and to the stern line of which she was attached, nor the Otsego, which lay a little further up, had any lights or lookouts. The master, mate, and the seaman of the Martha and Elizabeth testify that neither the Aulalia nor the Ocean Spray were discovered until the schooner had approached them within a distance of one hundred yards. Her helm was immediately put to port, her main sheet hauled in, and every effort made to avoid a collision. But the nearness of the vessels and the force of the ebb tide, rendered their efforts abortive, and the bows of the schooner struck the Aulalia amidships, carried her from her moorings, and past the Ocean Spray, and up to the vicinity of the Otsego. The claimants contend that the absence of lights on the Aulalia and the other vessels near her was the real cause of the accident, and was also such a violation of the act of congress as will bar any claim for its consequences. On the part of the Aulalia it is urged that she was anchored on the beach, out of the channel, and where she was not required to show a light, and where no collision could occur, except through the gross fault and mismanagement of the colliding vessel. The place where the Aulalia lay is fixed by the witnesses with tolerable precision; but there is some discrepancy in the testimony as to whether she lay in the channel at the edge, or some ten or fifteen yards, or, as one witness says, thirty or forty yards inside of it.

The Aulalia came in at about eleven at night, when she was moored by an anchor and a stern line to the kedge of the Ocean Spray. The persons who were on board the latter vessel, or who were on shore, were unable to state the precise position. The testimony has, therefore, been chiefly directed to the establishment of the position of the Ocean Spray; and it clearly discloses as the fact, that the Aulalia and not the Ocean

Spray was struck by the schooner, and proves that the former must have been, at least, as far out from the shore as the latter —she was probably a little further.

Hays, a seaman on board the Aulalia, testifies that she was more than thirty or forty yards from the channel. Cole, the master of the Otsego, and a witness for the libellant states that the Ocean Spray lay just inside the edge of the channel—"the bow was just at its edge, certainly not in it—her bow was about one hundred and fifty feet from the beach."

Hale, a seaman on the Otsego, testifies, that the Ocean Spray was seventy-five yards from the dry beach—she was not in the channel. "The fishing vessel was away inside the channel." This latter statement is contradicted by the libellant, the master of the Aulalia, who states that the Ocean Spray lay fifteen yards inside the channel, but that the Aulalia was two or three yards nearer to it than the Ocean Spray.

Miller, a seaman on the Otsego, testifies, that the Ocean Spray's stem was about six or seven feet from the edge of the channel; that the distance from the edge of the channel to high water-mark was about twenty yards.

From these statements of the libellant's witnesses, it may be fairly concluded that the Ocean Spray and the Aulalia were moored at, or very near to the edge of the channel, if not actually in it. And this conclusion is corroborated by other circumstances.

The libellant's witnesses state that the Ocean Spray was high and dry at low tide. But this, though confidently asserted, seems hardly reconcilable with other facts in the case.

She drew six feet. If she was high and dry at low water, at high water she would have at most six feet—scarcely enough to float her. In that case she must have gone in at the very top of the tide, and yet the witnesses all state that she went in at least half an hour before high water.

The collision occurred at half tide. The boom of the Martha and Elizabeth struck her rigging. The Aulalia, said to have been even further in than the Spray, was struck by the schooner's bow; the latter drew four and a half feet. There must have been, therefore, at least that depth of water where the Spray lay at the time of collision. But if she was high and dry at low tide she would have been in only three feet of water at half tide, and the schooner, drawing four and a half feet, could not have reached either her or the Aulalia.

Again, she was hauled into the channel on the following morning about 9 or 9½ o'clock —high water occurred at about 12. She was hauled off, therefore, some hours at least before high water, and must at that time have been in at least six feet of water, otherwise she could not have been moved.

These considerations, and the testimony which has been cited, establish that the Ocean Spray and Aulalia were not upon the beach, out of the channel, and removed from the ordinary track of vessels entering or leaving the harbor. They lay, I am satisfied, either partly in, or very close to the edge of the channel, and in a position where, without lights, they were exposed to the danger of collision.

The question thus presents itself: Was her position such as to excuse the Aulalia from complying with the requirements of the act of congress, art. 9, of the regulations for preventing collisions on the water? Act April 29, 1864 (13 Stat. 60), provides that "Fishing vessels and open boats when at anchor, or attached to their nets and stationary, shall exhibit a bright white light. Fishing vessels and open boats, however, shall not be prevented from using a flare-up, in addition, if considered expedient."

The language of this regulation is positive and general. I know not by what authority a court can in any case excuse a failure to obey it. It certainly cannot in a case like the present.

The "channel" referred to by the witnesses is, as all agree, not more than fifty yards wide at the point where the Aulalia was moored. The harbor is a frequent resort of coasting craft as a sort of refuge. In entering it these vessels are under no obligation or necessity to scrupulously observe the limits of the channel, even if it were at all times practicable to do so. They are usually of light draught, and are at liberty to go wherever the depth of water is sufficient. The Aulalia was moored, if not in, yet by her own admission, very near to the channel, and in water deep enough to be navigated by vessels of the schooner's draught of water, as is proved by the fact that a collision occurred. It is not easy to imagine a case where common prudence would more imperatively demand the exhibition of a light. If not precisely in the track which a vessel would, pursue in the daytime, and under favorable circumstances, she was very near to it, and in a track which vessels of light draught entering the harbor at night take either involuntarily or voluntarily, as in the absence of any light to warn them of danger, they would be justified in doing.

The Aulalia being thus clearly in fault, the burden of proof is on her to show that, notwithstanding that fault, the accident would not have occurred except for the negligence of the colliding vessel.

The Martha and Elizabeth carried the lights required by the act of congress, but that fact, and the absence of lights on the part of the Aulalia "did not confer upon the former vessel any right to violate or disregard the rules of navigation, or to neglect any reasonable precaution to avoid a collision which the circumstances afforded the means and opportunity to adopt." Chamberlain v. Ward, 21 How. [62 U. S.] 567.

It is alleged that the schooner entered the harbor under too great a press of canvass. But the testimony clearly establishes that she carried only the usual and necessary sail. Her speed, after rounding the point, is said to have been about three miles an hour.

It is urged that she should, when she discovered the Ocean Spray, have let go her anchor, but the experts who have been examined, deny that this would have been proper or expedient. The bottom of the strait was treacherous, the passage narrow, and she would probably not have been brought up by her anchor, until chain enough had been paid out to expose her to the risk of being driven on shore by the ebb tide. The vessel was not seen by the schooner, until she had approached within a hundred yards; had they exhibited lights, they would have been discovered at twice that distance. It does not lie in their mouths to urge that when the collision had been rendered imminent, if not inevitable, by their own fault, the other vessel did not, in the emergency, adopt the very best course, or that which subsequent reflection may suggest as most expedient. For even an error in judgment, under such circumstances, the master of the schooner is not responsible, provided he has exercised reasonable skill and diligence. The only point on which I have felt doubt, is whether the night was not sufficiently clear to permit the schooner to discover the vessels at anchor, as soon as she rounded the point, and at as great a distance as if they had carried lights.

The witnesses for the libellants declare that the moon was shining brightly, obscured only by a slight haze, and that it was sufficiently light to distinguish objects at a distance much greater than that from the point to the bight where the vessels were moored.

On the other hand, the master, mate, and seamen on board the schooner, swear that they kept a vigilant look-out and that the vessels were not seen until within 100 yards. If the witnesses on either side are deemed equally worthy of credit, the positive testimony that the vessels were not seen by a vigilant look-out, is entitled to more weight than the testimony of those who state that, in their opinion, they could or should have been seen.

There are some circumstances which corroborate the testimony of the respondent witnesses. The sinuous and difficult nature of the navigation, the narrowness of the channel, and the probability that, if well known to the master, that other vessels might be in his way, render it extremely improbable that in entering the harbor, he would not, for his own safety, have maintained a vigilant look-out. If he did so, he has done all that his duty required.

It is admitted that, as shown by the almanac, the moon, at the time of the collision, had passed the meridian, and was about five hours above the horizon. So far as I am able to judge, the effect of this must have been to cause Bodega Head to project to the eastward over the water, a shadow, in which vessels moored near its base would be enveloped. They would thus, to a vessel entering the harbor, be not only obscured by the shadow of the bluff, but with its dark side for a background, would be less easily discernible than if on a darker night, their hulls and spars had been brought into relief by a sky or horizon behind them.

If these views be just, it results that the libellants have not shown that the accident was due to the fault or negligence of the schooner; nor have they repelled the presumption that it was caused by their own neglect of a positive requirement of the law. The libel must, therefore, be dismissed.